# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT KNOXVILLE
## October 13, 2015 Session

## STATE OF TENNESSEE v. MARVIN E. POTTER, JR.

### Appeal from the Criminal Court for Washington County
### No. 39694  Jon Kerry Blackwood, Senior Judge

_____

### No. E2015-00013-CCA-R3-CD – Filed March 8, 2016

_____

The Defendant, Marvin E. Potter, Jr., was convicted by a Washington County Criminal Court jury of two counts of premeditated first degree murder, for which he is serving consecutive life sentences.  On appeal, he contends that (1) the evidence is insufficient to support the convictions, (2) the trial court erred in admitting hearsay evidence as statements of co-conspirators, (3) the trial court erred in denying the Defendant's motion for a mistrial due to an absent material witness, and (4) the State's use of visual aids during closing argument constituted prosecutorial misconduct.  We affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

David L. Robbins, Johnson City, Tennessee, and H. Randolph Fallin, Mountain City, Tennessee, for the appellant, Marvin E. Potter, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Anthony Clark, District Attorney General; Dennis Brooks and Matthew Roark, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions pertain to the January 31, 2012 killings of Billie Jean Hayworth and Billy Clay Payne in Johnson County.[1]  The lifeless bodies of Ms. Hayworth and Mr. Payne were found in the home they shared with their infant son and

---

[1] The trial court granted a change of venue to Washington County.

Mr. Payne's father. Both victims had been shot in the head, and Mr. Payne's neck had been cut. At the trial, the State's theory was that the killings were related to disagreements between the victims and the Defendant's adult daughter, Jenelle Potter,[2] which had played out on social media websites and at in-person encounters involving the Potter family and the victims.

According to friends of Ms. Hayworth, Jenelle began interacting with the friends and Ms. Hayworth through MySpace and Facebook around 2008 or 2009. Lindsay Thomas testified that shortly after she accepted Jenelle's Facebook friend request, Jenelle began posting statements on Facebook that Ms. Thomas and Ms. Hayworth were "mean girls." Ms. Thomas said Jenelle captured images from Ms. Thomas's and Ms. Hayworth's Facebook pages and posted them on Jenelle's page, "tagging" them with Jenelle's name to make it appear as if the photographs depicted Jenelle, rather than Ms. Thomas or Ms. Hayworth. Ms. Thomas said she called Jenelle and asked her to stop talking about her and Ms. Hayworth. Ms. Thomas said that Jenelle claimed to have no knowledge of what Ms. Thomas was talking about and that Jenelle did not write anything about Ms. Thomas and Ms. Hayworth on Facebook. Ms. Thomas said that after this conversation, she began receiving as many as fifteen to twenty telephone calls per day in which no one spoke but in which she could hear breathing. Ms. Thomas said that she knew the calls were from Jenelle because they came from a telephone number Ms. Thomas recognized as the Potters' home number and that Ms. Thomas told the caller to stop calling. Ms. Thomas said that sometimes a man, whom she assumed was the Defendant, came to the phone and told Ms. Thomas to leave the caller alone. Ms. Thomas said she told the man that the other person had called her and that Ms. Thomas had not placed the call. Ms. Thomas said that over time, she became more stern with the caller when the calls continued.

Ms. Thomas testified that in May 2011, she filed telephone harassment charges against Jenelle. She said that by this time, she and Ms. Hayworth had removed Jenelle from their Facebook friends lists. Ms. Thomas said that the court dismissed the charges after a November 2011 hearing because Ms. Thomas had been unable to prove that Jenelle was the caller. Ms. Thomas said Ms. Hayworth attended court with her.

Ms. Thomas acknowledged posting comments on the website Topix and thought her posts were related to comments she attributed to Jenelle. She said she could not

[2] The Defendant's daughter, Jenelle Potter, and his wife, Barbara Potter, are both involved in this case. Because they share the same last name, we will refer to Jenelle Potter and Barbara Potter by their first names. We mean no disrespect. Lyndsey Potter testified as a State's witness, as did Lindsay Thomas. In order to differentiate between these witnesses who share the same first name, we will refer to Lyndsey Potter as Ms. Potter and to Lindsay Thomas as Ms. Thomas.

know with certainty who posted the comments she attributed to Jenelle because a person could post comments using any name.

Ms. Thomas testified that she had seen Jenelle in public and that she had never confronted her publicly or physically. Ms. Thomas said she probably "said stuff back to" Jenelle when she saw Jenelle in public.

Lyndsey Potter, a friend of Ms. Hayworth's, testified that she met Jenelle in 2008 or 2009 at Food Lion, where Ms. Potter's brother was employed. She was unaware of any familial relationship she had with the Defendant and his family and said Potter was a common last name in Johnson County. Ms. Potter said she and Jenelle became friends on social media websites shortly after meeting. Ms. Potter said she did not have any problems with Jenelle until Jenelle's trouble with the victims started. Ms. Potter said that Jenelle posted a photograph of Tara Osborne, Ms. Thomas, and Ms. Hayworth with "some pretty nasty" comments, that Ms. Potter told Jenelle that what she had said was inappropriate, and that Jenelle did not remove the photograph. Ms. Potter said that a few months later, Jenelle sent her a private Facebook message stating that Jenelle was sick and that Ms. Thomas and Ms. Hayworth would not stop bothering her. Ms. Potter said that after she told Jenelle that she did not think Ms. Thomas and Ms. Hayworth were bothering Jenelle, Jenelle "blocked" her on Facebook. Ms. Potter said Ms. Hayworth's problems with Jenelle began when Ms. Hayworth and Ms. Thomas removed Jenelle from their Facebook friends lists.

Tara Osborne testified that she knew the victims for about five years before their deaths. She said that she first met Jenelle at Food Country, that Jenelle had been talkative while they stood in the checkout line, and that she received a Facebook friend request from Jenelle afterward. Ms. Osborne said they began "instant messaging" each other and that after she gave Jenelle her telephone number, they began talking and developed a "small friendship." Ms. Osborne said that after the "drama" started, however, she wanted to remove herself from the situation. Ms. Osborne said Jenelle recounted various ways in which Jenelle was mistreated: people harassed her, people knew information about her home life, she could not see her boyfriend, she disagreed with how her father treated her, and she did not like her mother's behavior. Ms. Osborne said that she disabled a Facebook feature that allowed other users to see when she was online and that she eventually removed Jenelle from her Facebook friends list. Ms. Osborne said that a couple of weeks later, she received a private Facebook message from a Facebook user with the same profile name and photograph as Jenelle. Ms. Osborne responded to the message, stating that she did not want to be in the middle of any disputes and did not want to be contacted. She said that when the harassment started, a male contacted her and that she told him she was going to be a "b---- he did not want to p--- off." She said

-3-

the male who called her tried to make noises from a horror movie and had an "insanity laugh."

Ms. Osborne testified that she went to the Sheriff's Department and brought harassment charges relative to the actions. She said she took a voicemail message to the sheriff's office that had been left on her cell phone. She said that she was assisted by an unidentified woman in completing the paperwork and that the Sheriff's Department did not investigate on her behalf. She said the case was "thrown out" because she had not filed it properly and did not know what she was doing. Ms. Osborne said she "fixed it" in order to prevent the Potters from contacting her, but she did not specify what she did. Ms. Osborne said she was a witness in Lindsay Thomas's harassment case against Jenelle.

Ms. Osborne read an email that had been received as an exhibit, in which the author claimed to have pulled a gun on "Tara" and told her she needed to worry about "her own life." The author also claimed to have threatened Tara that her baby could be taken from her. Ms. Osborne denied that this occurred.

Linda Stephens testified that she worked at Larry Potter's store, which Ms. Hayworth frequented. She said that on one occasion when Ms. Hayworth was outside the store pumping gas, a car containing two people pulled into the parking lot between the gas pumps and the store. Ms. Stephens said the occupants of the car threw up their arms and leaned in as if they were screaming and pointing. She said Ms. Hayworth appeared upset. Ms. Stephens went to the door and asked if Ms. Hayworth was okay and if Ms. Stephens should call the police. Ms. Stephens said that when she mentioned the police, the car fled the parking lot. Ms. Stephens said Ms. Hayworth was upset, crying, trembling, and shaking. Ms. Stephens said Ms. Hayworth told her the people in the car had been Jenelle and Barbara Potter. Ms. Hayworth told Ms. Stephens that the Potters called her "trash" and said Ms. Hayworth did not deserve to have her child, who was in Ms. Hayworth's car. Ms. Stephens said Ms. Hayworth stated she was on her way to her son's first pediatric well visit and that because Ms. Hayworth was upset by the incident, Ms. Hayworth planned to return home to have Mr. Payne accompany her to the appointment. Ms. Stephens said Ms. Hayworth left without obtaining change for her payment for the gas.

Tracy Greenwell, Mr. Payne's brother, testified that he and Mr. Payne had assisted in getting Jenelle and Jamie Curd together romantically. He said he had been friends with both of them and that Jenelle met Mr. Payne when Mr. Greenwell brought Jenelle to his father's house. He said that he had liked Jenelle and got along well with her but that she became "mean" after she and Mr. Curd began dating. Mr. Greenwell said Mr. Payne

showed Mr. Greenwell a three-ring binder containing comments Jenelle made on the Topix website. Mr. Greenwell said the Topix comments were about Mr. Payne, Ms. Hayworth, and "Lindsay" and that this occurred in approximately October 2011. Mr. Greenwell said that Mr. Payne and Mr. Curd had a confrontation after Mr. Payne told Mr. Curd things at work and then went home to find the subject of their conversation posted on Topix. Mr. Greenwell said that due to the conflict, Mr. Payne and Mr. Curd's employer placed Mr. Curd on a different shift from Mr. Payne. Mr. Greenwell acknowledged that a person did not have to use his or her own name to post on Topix. Mr. Greenwell said he was aware of the harassment charges involving Jenelle.

Mr. Greenwell testified that Mr. Payne took pain medication and had a drug problem, but Mr. Greenwell said Mr. Payne started going to a Suboxone clinic after meeting Ms. Hayworth and realized he wanted to be involved in a serious relationship with her. Mr. Greenwell said Mr. Payne changed positively after becoming a father. Mr. Greenwell acknowledged that Mr. Payne sometimes sold drugs.

Mr. Greenwell testified that Mr. Curd had not been to the house where Mr. Payne and Ms. Hayworth lived anytime close to when the crimes occurred. Mr. Greenwell said, though, Mr. Curd had been to the house enough to be familiar with it.

Bradley Osborne testified that he and his wife, Tara Osborne, were friends with the victims. He said he had been aware of a Facebook dispute between Jenelle and people close to him, although he did not identify with whom, other than his wife. He was aware his wife had gone to court relative to proceedings against Jenelle. He said Ms. Hayworth did not go to court with Ms. Osborne. Mr. Osborne said Mr. Payne told him about a couple of confrontations Mr. Payne had with the Defendant. Mr. Osborne said that the Defendant confided in him about things Jenelle posted on the Internet and that the conversation could have occurred before November 2011. Mr. Osborne was unaware of Mr. Payne's and the Defendant's having agreed to end their feud.

Mr. Osborne testified that he and Mr. Payne carpooled to work together. He said that his custom was to leave his house around 6:20 to 6:25 a.m. and to drive to Mr. Payne's house. Mr. Osborne said that they typically left Mr. Payne's house around 6:30 to 6:35 a.m. and that they had to be at work by 7:00 a.m. Mr. Osborne said that on January 31, 2012, he waited outside the victims' house for a few minutes, but Mr. Payne did not come outside. Mr. Osborne tried to call Mr. Payne and to send him a text message, but Mr. Osborne's cell phone was not working. Mr. Osborne went to the sliding glass door and went into the house, calling out for Mr. Payne but receiving no response. Mr. Osborne said he went to a telephone in the living room and called Mr. Payne's cell phone to try to wake Mr. Payne. Mr. Osborne said he could hear an alarm

-5-

from a clock that sounded like it was in the victims' bedroom. He thought he heard a baby whimper, but he was unsure. Mr. Osborne said he did not go to the bedroom out of respect and did not think anything unusual had happened. He left and went to work.

Roy Stephens testified that he and his wife, Linda Stephens, were separated at the time of the homicides and that he had stayed at the victims' house on occasion during the separation. He received his mail at the victims' house. On January 31, 2012, he and Ms. Stephens went to the victims' house for Mr. Stephens to retrieve his mail. He said that he arrived around 10:10 a.m. and that he saw the victims' cars outside the house but did not see Mr. Payne's father's car. Mr. Stephens went in through the sliding door at the back of the house and yelled the victims' names but did not receive an answer. He suspected something was not right, and when he went to the victims' bedroom, he found Mr. Payne's body. Mr. Stephens went outside to tell Ms. Stephens to call 9-1-1, then went back into the house. He found Ms. Hayworth's body in another bedroom. The victims' infant son was in Ms. Hayworth's arms, and Mr. Stephens took the child from her arms.

Dr. Karen Cline-Parhamovich, an expert in forensic pathology, testified that after performing the victims' autopsies, she determined that Mr. Payne's cause of death was a gunshot wound to the face and sharp force injuries to the neck. She thought the gunshot wound would have occurred first. She said that he did not have any defensive wounds but that he had a shoulder wound that might have been caused by "overshot" of a weapon. Dr. Cline-Parhamovich said Ms. Hayworth's cause of death was a gunshot wound to the head. She did not observe any defensive wounds on Ms. Hayworth's body.

Tennessee Bureau of Investigation (TBI) Agent Scott Lott testified that he responded to the victims' home. He said that both victims appeared to have died violently and that Mr. Payne, who was dressed in his underwear, appeared not to have dressed. He said Ms. Hayworth's body was in another bedroom. He said the shotguns and a .22-caliber pistol at the scene did not appear to have been used to fire the shell casings the police found at the scene, which he said were .38-caliber or nine-millimeter casings. Agent Lott said they recovered a small quantity of methamphetamine and a credit card, which could have been used to make a "line" to snort the methamphetamine, on a piece of furniture in the room in which Ms. Hayworth's body and the infant were found. He said they also recovered a pipe, and he thought an analysis showed it contained methamphetamine and codeine residue. He said they found prescription medication at the victims' house.

Agent Lott testified that Mr. Payne's cell phone records showed that Calvin Williams and Matthew Richardson, friends of Mr. Payne's, called Mr. Payne throughout the evening of January 30, 2012. Agent Lott said Mr. Williams and Mr. Richardson

cooperated with the investigation. Agent Lott said that when Mr. Williams was interviewed, Mr. Williams stated that Mr. Payne sold some of the medication Mr. Payne received at a Suboxone clinic and that Mr. Williams bought eight to ten Suboxone strips from Mr. Payne. Mr. Williams stated that Mr. Payne sold other pills, but Mr. Williams did not know Mr. Payne's source of the other pills. Mr. Williams said that he and Mr. Richardson attempted to arrange a meeting with Mr. Payne on the evening of January 30 but that Mr. Payne sent a text message at 11:30 p.m. stating that he was tired and was not going to meet them.

Agent Lott testified that the investigation showed that the only people with whom the victims had conflicts were the Defendant, Barbara, and Jenelle. Agent Lott said he and Chief Deputy Joe Woodard spoke to the Potters at their home on February 1, 2012. He said Chief Deputy Woodard recorded the conversation.

The recording of the February 1, 2012 interview of the Potters was played for the jury. In it, a male stated that they were shocked by the victims' deaths and learned of them on the news. Two women's voices are heard on the recording. One female ("Female 1"), whom we infer from the context of her statements was Jenelle, stated that the victims had been unhappy she had prevailed in a court case she won against them that pertained to harassment of Ms. Thomas and Ms. Hayworth but that they did not have problems afterward. Female 1 said that her social media account had been hacked, that "they" made three Facebook profiles using her photograph, and that her friends "up north" had been harassed online. She said she posted, "Bill, Billy, and Lindsay,[3] please leave me alone." Female 1 said she knew "they" would kill her parents to get to her. She denied stating on the internet that she wished "they" were dead. Female 1 said that around the time of the hearing in the harassment case, "Lindsay" created a fake email address and stole Female 1's password. Female 1 said Jamie Curd helped her obtain a new Facebook password so "they" would not hack her account.

Female 1 said "Lindsay" stated in court that "Lindsay" hoped Female 1 would die. The male corroborated that this occurred. Female 1 said men had threatened to rape her. Female 1 said she was home alone when someone kicked in the garage door.

Female 1 said Mr. Payne stated falsely that Mr. Curd sold drugs and that Female 1 drove. She said she did not drive. She said Mr. Payne and Mr. Curd had a disagreement and that Mr. Payne was upset with Mr. Curd because Mr. Curd went to court with the Potters relative to the harassment case.

---

[3] She was not asked to clarify if she referred to Lindsay Thomas or Lyndsey Potter. Our spelling of the name should not be interpreted as a specific reference to Lindsay Thomas, rather than Lyndsey Potter.

Female 1 said she had been friends with Tracy Greenwell about five years earlier. She said she had gone with Tracy to a party at the house the victims shared with Mr. Payne's father but felt uncomfortable about some things that were occurring and waited in the car. Female 1 said that people were drinking and that drugs, guns, and knives were present. The male said the gun that Female 1 described was an AK-47. She said "Lindsay" had cursed at her at a store for having a food stamp card.

Female 1 denied that Mr. Curd was her boyfriend. She said she had health problems and ended up in the hospital after Mr. Payne shot at their house one night. She said that someone shot at Mr. Curd's house and that Mr. Curd stated he had seen Mr. Payne's truck.

A second woman ("Female 2"), whom we infer from the context of her statements was Barbara, provided corroborative details and confirmation relative to some of the statements of the male and Female 1.

Agent Lott testified that the authorities interviewed Jamie Curd one or two days after speaking with the Potters at their home, that Mr. Curd denied involvement. They interviewed Mr. Curd again on February 6. Agent Lott said that during the second interview, Mr. Curd called the Defendant, and the conversation was recorded. Agent Lott said that based upon Mr. Curd's statement, in which Mr. Curd said he had been present for the homicides, and the contents of the call between Mr. Curd and the Defendant, the authorities drafted arrest warrants for Mr. Curd and the Defendant. Agent Lott said they went to the Defendant's house to arrest him and to execute two search warrants. Agent Lott acknowledged that Mr. Curd later recanted the statement upon which the warrants were based. In a third statement, Mr. Curd stated that he had not been present and that the Defendant told him what happened.

Agent Lott testified that when the authorities went to the Potter residence to arrest the Defendant, they were aware that the Defendant was usually armed and that numerous weapons were in the house. Agent Lott said that when they advised the Defendant he was under arrest, the Defendant's right hand moved quickly to the Defendant's side and that they stopped the Defendant. The Defendant had a loaded .45 caliber gun holstered on his right hip. Agent Lott did not know if the Defendant was going to shoot. Agent Lott said, though, that the Defendant did not resist and was cooperative during the arrest.

Agent Lott testified that after the Defendant was arrested, the Defendant was interviewed for several hours. The interview was recorded and played for the jury. In the interview, the Defendant repeatedly denied any involvement and knowledge of who

committed the homicides. When told that Mr. Curd had implicated him, the Defendant said Mr. Curd was "throwing [him] under the bus."

In the statement, the Defendant said his and his wife's lives had been threatened. He said "they" had threatened to cut off Jenelle's head. He said "Lindsay" had posted online that she had a $3,000 bounty on his, Barbara's and Jenelle's heads. The Defendant said he had heard people talking about kidnapping Jenelle from a bathroom, taking her to a field, raping her because she was a virgin, and murdering her. The Defendant said Mr. Payne had claimed Jenelle stated that Mr. Payne was a bad father. The Defendant said "Linsday" created three fake Facebook profiles of Jenelle.

The Defendant said in the statement that he had been to the victim's house once to take them some wood he was unable to use. He said Mr. Payne had been to the Potter residence three times.

In the statement, the Defendant denied that Mr. Curd was in love with Jenelle and said the matter had been "straightened out a long time ago." He said that Jenelle was thirty years old and that Mr. Curd could not take care of her. He denied that Mr. Curd committed the crime to prove to the Defendant that Mr. Curd could take care of Jenelle.

The Defendant said in the statement that he and his truck had been at home until 6:00 a.m. on January 31, 2012. At 6:00, he left to go to the Veterans' Administration (VA). He said his neighbors who said Mr. Curd's car was at his house that day were incorrect. He said Mr. Curd might have been at his house on the night of January 30 and might not have left until 1:00 a.m. on January 31.

In the interview, the Defendant was confronted with the telephone call between Mr. Curd and himself that occurred during Mr. Curd's second interview and in which Mr. Curd asked if the Defendant got rid of everything from "Billy's." The Defendant denied knowing what happened and said he did not get rid of anything. In the telephone call, the Defendant told Mr. Curd that no reason existed for anyone to point fingers at Mr. Curd "just because Bill was pulling the s--- he did." The Defendant said in the call that Mr. Payne was involved in drugs and the homicides looked like a "drug deal gone bad."

The Defendant acknowledged in the interview that he had several weapons and types of ammunition at his house. The Defendant eventually stated that Jenelle and Barbara did not know what he had done. He was permitted to call Barbara, and the call was recorded. In the call, the Defendant told Barbara that he was involved and that he "did it." He said he did it because of what "they" tried to do to her and Jenelle.

Agent Lott testified that immediately after the Defendant's interview, Agent Lott made a list of the Defendant's medications. He said that although he knew the Defendant had been prescribed oxygen and medications and was a patient at the Veterans Administration Hospital, Agent Lott did not have any concerns that the Defendant, who had hearing loss, had been unable to understand what was discussed in the interview. Agent Lott was unsure if the Defendant wore his hearing aids during the interview, but Agent Lott described the Defendant as lucid and said the Defendant seemed to understand the questions. Agent Lott said that although the Defendant had some difficulty hearing, the Defendant was able to hear "pretty well" during the interview. Agent Lott said the Defendant asked the officers to repeat things if necessary. Agent Lott acknowledged that the Defendant did not use supplemental oxygen during the three and one-half hour interview.

Agent Lott testified that while the Defendant's interview was taking place, other officers executed search warrants for the Defendant's house and truck. Agent Lott said bags of shredded papers were collected from the Defendant's truck. They were analyzed and pieced together by a TBI employee over a period of about one month. The documents were received as an exhibit. Agent Lott identified two email addresses in the documents as belonging to Barbara and Jenelle. In the assembled documents, the author and recipient were not always specified. Some of the messages expressed dissatisfaction and factual specifics related to the conflict between the Jenelle and the victims, "Lindsay," and "Tara." Some of the messages appear to be between Barbara and "Chris." Read in context, some of the messages appear to be reproductions of communications that originated from other accounts.

In one of the messages, the unidentified author stated to "Chris" that "Bud" was mad and the author was "100% behind whatever happens." The author stated that "[y]ou guys" should meet when they were ready. The author stated that Bud might have his "ID" by then and might be able to use "CIA guns, etc. for his protection [and to] get the job done." The author stated, "They all need to go & the ones left need to be given a big scare as they watch & wonder 'am I next?'" The author stated that Bud knew the area well and that Bud had said he would help Chris. The author stated that Bud was "fed up & ready." Agent Lott testified that he was unable to identify a person named Chris who was associated with the CIA and this case. Agent Lott said that Jenelle's sister was named Christy and that he spoke with a high school classmate of Jenelle's named Chris who was a law enforcement officer in another state but determined that the classsmate was not the person for whom they were looking. Agent Lott said he never spoke to anyone from the CIA who acknowledged any association with the Potter family.

-10-

In another message, the unidentified author told Chris not to let anyone see the "list." The author instructed Chris to continue scaring "these 3 girls w/guns, etc&breaking their cars[.]" The author encouraged Chris to make things hard for "them" because "they" were making life hard for "us."

In a message from Chris to "Barbie," Chris stated that "they" were scared of Chris and that Chris wanted to kill all of them now. Chris stated that "Lindsay" and "Tara" started the dispute because they saw Jenelle using food stamps. Chris stated that Chris had a new boss, with whom Chris planned to talk about having someone call "Buddy." Chris stated, "He's in the computer they can look him up and he comes up CIA so he can be called for anything." Chris stated that Chris was sorry for Barbie and Jenelle.

In an April 4, 2011 message from an unidentified person to Chris, the author stated that Buddy was "raising hell today." The author stated that Buddy had been told he was activated in the CIA and was waiting for an "ID card" so Buddy would not have to bother "you guys" and that they were not doing their job correctly. The author stated "Mike" was angry and reprimanded three individuals. The author said "Bud" told unidentified individuals that he was tired of the harassment, particularly "Jen" and the author. The author asked if Chris had threatened "them physically anymore" and stated that "Billie," "Tara," and "Lindsay" needed to die. The author stated, "They are doing wrong. And Mike, of course, if he set you up,&he bought his death ticket." The author stated Mike questioned Bud about Bud's CIA work. Agent Lott testified that "Mike" in this message referred to Sheriff Mike Reece and that another name in the message referred to a Sheriff's Department investigator.

In a message without identification of the sender or the recipient, the author stated that he or she was going to kill "Lindsay," "Bill," and "Billie." The author stated that he or she was going to "get" Lindsay's car again and would do something much worse. The author stated that "Buddy is CIA" and that "buddy can kill thembefore [sic] they will so no worries there[.]" The author stated that the author was happy that Jenelle was happy.

In a message from Barbie to Chris, Barbie stated that if Chris did not "get them w/Bud," God or someone would. Barbie stated that men from the CIA had been in court. Barbie referred to Chris having discovered a "facebk [sic] Tara started on Jenelle."

In a message with an unidentified sender and recipient, the author stated that Bud had given up and would not work for "them" if they would not give him an ID. The author stated that the recipient's "CIA guys aren't really good at their jobs" because Bud had never been treated that way.

Another message states that the unidentified sender heard that the unidentified recipient had been on Bulldog Road "watching them all day." The sender told the recipient to do whatever the recipient had to do if the recipient felt "alright with it."

In a message from Jenelle to "mom" dated "May 5," Jenelle stated that "they" were using "Bill's" cell phone and that they were being "hateful f------ tonight." Jenelle stated that nothing scared her and that she guessed she "just need[ed] to shoot her 4 times in the f------ head and a few other times, and then she will be gone." Jenelle stated that she would "get the d--- f------. Pay back. For what they have done to you and me and a few of the guys." Jenelle also stated, "Let Buddy do his thing that's the best anything."

In a message from an unidentified sender to Chris, the author told Chris that Bud waited all night but "[t]hey did not show." The author stated that "all of them" were going to have to go to prison or die. The author stated, "We just can't take it anymore," and predicted that the author or Jen would end up back in the hospital. The author stated that Jenelle was trying to "keep her sugar down." The author stated that Bud wanted a phone number for "Dugger," whom Bud knew from "serving together in Nam." The author stated Bud wanted "to help you do 'things.'"

In a message dated November 14, 2011, the unidentified sender stated to an unidentified recipient that the sender's boss "has my back" if "Bill and them want to act like they do." The author stated that Bill did not take care of his children and hoped that "they" could not have more. The author stated that "Bill and them are really trying to kill" Jenelle and that Bill was mad at "Jamie."

A message sent to and from Barbara's email address and dated March 12, 2011, appears to be a summary of a previous communication. The author stated he or she was glad the recipient was "watching out for us." The author stated he or she was glad Bud's ID was coming.

A message dated March 30, 2011, which has both Jenelle's and Barbie's names at the top stated that the author pulled a gun on Tara, told Tara she needed "to worry about you d--- f----- life," and told Tara the author could have Tara's baby taken. The author stated that he or she was trying to get Buddy's ID more than ever.

An undated message from an unidentified sender to Chris stated that the author did not know why the CIA had not contacted Buddy, that Buddy was "in the computer as CIA," and that the author would try to determine the situation with Buddy's "card." The author stated that "we" told the police to stop driving by the recipient's house and not to worry because "they will be taken care of." The author stated that he or she wanted to do

what the author was "down here to do. To get Chrisite [sic] and then the cops and these's f------ and the girls. W---- bag no good s----." The author stated that Jenelle should not have any more issues and that two guys who worked with the author were going to take over the author's job.

An undated message from an unidentified sender to Chris stated that Bud was willing to work with and teach Chris to help ease Chris's concerns. The author stated that Bud had been trained in "CIA work & recon, black ops, etc." and that Bud was ready to help and "go at it with" Chris. The author suggested a place for Chris and Bud to meet where no one would watch them.

An undated, handwritten note stated that Bud and Jamie had a "good time & session last Thursday" shooting and cleaning guns and that "we" ate together and worked with a computer.

A January 25, 2012 message from Chris to an unidentified person stated that Chris hoped "Buddy and him get them and ASAP would be great." Chris stated that "Lindsey" had moved in with "Tim" and that Chris hoped Lindsey died before her birthday on January 28. Chris stated that he or she "made sure Jamie got home from work" the day Chris passed Jamie in town. Chris stated Bill had been "saying s--- on the phone to others."

An April 3, 2011 message from Jenelle stated, "I would love to meet Buddy," and that she was trying to determine where Lindsay lived.

An "April 1" message from Jenelle stated that she was upset but "got" Lindsay today. Jenelle said Lindsay was "hurt a little" but that Lindsay's car "will not be ready for a while." Jenelle stated her desire to kill Lindsay.

A "4/21/201"[4] message from Jenelle to Barbara with the subject "Chris" stated that Lindsay had been pursued and ticketed by police. Jenelle expressed hate for Bill and said Bill had no idea what Lindsay and Billie would do but would learn the hard way. Jenelle stated that people drove past the recipient's house and that she would put the people back in hell. Jenelle asked if Buddy went to get a report and to determine whether "they took a report on Jenelle up there" relative to an incident in a store.

---

[4] The date on this document, which was reconstructed after having been shredded, is incomplete.

-13-

An undated message from Jenelle to an unidentified recipient stated that Jenelle did not know the recipient's real name and that they were using "many names/codes." Jenelle said Bill's truck and Lindsay's car were driving slowly past Jenelle's house. Jenelle said it would be "too bad for them" if she or "dad" got a "chance." She said "J" was going to look at the computer regarding deleting "more about dad so that's good."

An April 22, 2011, message sent from and to Barbara's email account and titled "FB-Barb to Chris 4/22" stated that the author thought Jenelle was going to die "with all this crap."

An undated message with an unidentified sender and recipient stated that the author was undecided about whether to let Lindsay live. The message referenced killing "Bill and Billie and that d--- baby" and some police officers. The author stated that he or she was getting a sense of the daily routines of an unidentified female and her "BF." A message on the same page below this message from Jenelle advised the recipient to carry his or her guns at all times.

An "April 3" message from Chris expressed concern for Jenelle and whether she would hurt herself. Chris stated that "they" would be sorry and that "I will kill."

An April 6, 2011, message from Barbara stated that Lindsay had bragged that she, Tara, and Billie were going to "get Jenelle" tonight. The author stated, "Buddy is in 'Vietnam Jungle Recon Mode.'" The author stated that Chris Campbell took Jenelle "off of his Facebook."

An undated message without identification of the sender or recipient stated that the author was at a "red point. KILL KILL KILL and don[']t worry about them." The author wished that Buddy had his ID because he would be able to work with "us."

Johnson County Chief Deputy Sheriff Joe Woodard testified that during the execution of a search warrant, a spiral notebook was recovered from a computer room at the Defendant's house. Chief Deputy Woodard said the notebook contained what appeared to be passwords, memoranda about Topix, and names. He said that during the search, Barbara Potter began ripping some papers, which he took from her. He said the papers included photographs of Ms. Hayworth, Ms. Thomas, Ms. Potter, and an unknown man. Chief Deputy Woodard said several guns were collected during the search at the Defendant's house.

Chief Deputy Woodard testified the Defendant, Barbara, and Jenelle made several complaints to the Sheriff's Department relative to people hacking their emails and about

Facebook. He said they also complained about telephone calls involving Ms. Hayworth, Ms. Thomas, and Ms. Osborne. He was unaware of the Potter family's being the victims of vandalism or assault involving "that group of people."

A recording made by jail personnel of a telephone call between the Defendant and Barbara during the Defendant's pretrial detention was played for the jury. In the call, Barbara stated that she and Jenelle were "cleaning up" and getting rid of junk. The Defendant stated that he had planned to take items to the landfill. Barbara stated that she knew the Defendant had loaded his truck. She mentioned something "shredded," but her full statement is unintelligible on the recording in the record. The Defendant asked if the police had taken everything that had been in his truck, and Barbara responded affirmatively.

The Johnson County Sheriff and a deputy sheriff testified that the Defendant made statements to them before the homicides about having worked for the Central Intelligence Agency (CIA). The sheriff said the Defendant claimed to have been awaiting further orders. Agent Lott testified that during Mr. Curd's interview, Mr. Curd asked if the CIA was present.

TBI Special Agent Forensic Scientist Lisa Wessner, who led the crime scene response team that processed the Defendant's truck, testified that five bullets and four pieces of paper were recovered from the center console. She said the papers appeared to be printed from Facebook or MySpace pages.

TBI Special Agent Forensic Scientist Steve Scott, an expert in firearms identification, testified that the bullets recovered from the Defendant's truck were two different brands and that all were .38-special caliber lead bullets. He said bullets of this caliber could be fired from .38 special or .357 magnum weapons. He said that all of the bullets had scratches, or tool marks, on the sides and that if they were fired from a gun, these areas would not come into contact with the firearm. He said that the markings were not uniform, as they would be if made by a machine, and that they were "after market" modifications which would not have been created by the manufacturer. He referred to the bullets with the alterations as a "poor man's hollow point" because the alterations were used to make the bullet expand upon striking a target.

Regarding two fired bullets recovered at the scene, Agent Scott testified that the bullets were made by different manufacturers. His report, which was received as an exhibit, stated that the fired bullets were "38/357 caliber, lead bullets." He said that "after market tool marks" were visible on one of the bullets and that he could not determine if the other one contained such marks because the relevant area of that bullet

was missing. He had no opinion regarding whether the two bullets were fired from different guns. He said that they could have been fired from the same gun, with one bullet being slightly undersized for the gun, or they could have been fired from different guns. He said an unfired bullet from a bedroom in the victims' house had similar markings and was likely the same type, design, make, and manufacturer as the less intact fired bullet.

Agent Scott testified that of the guns recovered from the Defendant's house, six could have fired the spent bullets found at the scene, although he was unable to identify characteristics from which he could conclude that they were fired from any of the guns.

Christie Groober testified that she was the Defendant and Barbara's daughter and Jenelle's sister. Ms. Groober said she was estranged from her family. She said Jenelle had auditory processing disorders, but she did not think Jenelle was "borderline retarded." She agreed that Jenelle functioned at the level of a teenager and that Jenelle did not understand joking and took things seriously that were not meant that way. Ms. Groober said Jenelle graduated from high school after completing special education classes. Ms. Groober said her parents had always coddled Jenelle. Ms. Groober said that the Defendant had serious medical issues, including several that resulted from a 70' fall at a construction site that occurred when she was an infant, and that he had been unable to work since the fall.

Ms. Groober testified that she was familiar with Barbara's handwriting and was less familiar with Jenelle's handwriting. When she was shown the photographs Chief Deputy Woodard identified as the papers Barbara had tried to rip during the search of the Potter residence, Ms. Groober identified some of the handwriting as belonging to Barbara and Jenelle.

Ms. Groober testified that the Defendant collected guns. She said that her family shot guns together and that the Defendant took her target shooting when she was younger.

Jerry "J.D." Winebarger testified that he met the Defendant and the Defendant's family when Mr. Winebarger worked at Food Lion in 2011 and 2012. Mr. Winebarger said he and the Defendant discussed various topics. Mr. Winebarger said that the Potters talked about the victims frequently and that the Defendant disparaged the victims. Mr. Winebarger stated that a couple of months before the victims were killed, the Defendant said that if the Defendant had the chance, he was going to put a bullet through Mr. Payne's head. Mr. Winebarger said he did not think, at the time, the Defendant was

serious. Mr. Winebarger said he was aware of a disagreement between the Defendant and Mr. Payne that occurred in a parking lot.

Mr. Winebarger testified that a few days after the homicides, the Defendant and Jenelle were in the store and that the Defendant mentioned the homicides. Mr. Winebarger stated that when he said he did not know how someone could commit the crimes while Ms. Hayworth held her child, the Defendant and Jenelle gave him a "death look." Mr. Winebarger explained, "[I]f looks could have killed, I'd been dead then[.]"

Mr. Winebarger testified that he did not know the Potters other than from seeing them at the store. He said he went to school with Ms. Hayworth but had no other connections to anyone involved.

David "Calvin" Williams testified for the defense that Mr. Payne told him regularly about Mr. Payne's problems with the Potters. Mr. Williams said Mr. Payne was likeable and had no enemies other than the Potters. Mr. Payne had shown Mr. Williams a binder containing printed copies of things that had been said about Mr. Payne and Ms. Hayworth on Facebook.

Mr. Williams said that he had been present at Larry Potter's store for a meeting of "all of these people." He identified those present as Matthew Richardson, Mr. Payne, Jenelle, Barbara, and the Defendant. Mr. Williams said that he stayed in the car and did not hear everything. He said Jenelle, Barbara, and Mr. Payne talked at first and that the Defendant became involved later. Mr. Williams said Jenelle and Barbara were "belligerent" and that Mr. Payne was "agitated" but not angry. Mr. Williams later said this occasion was the only time he had seen Mr. Payne mad. Mr. Williams said Mr. Payne tried to show the binder to the Defendant because the Defendant and Barbara did not believe Jenelle had written the things reflected. Mr. Williams said it appeared the Defendant and Mr. Payne resolved their differences. Mr. Williams said that from what he gathered, the Defendant and Mr. Payne were going to contact each other if an issue arose. Mr. Williams said that afterward, Mr. Payne no longer mentioned any problems with the Potters. Mr. Williams said he had been around the Defendant daily.

Mr. Williams testified that on the evening of January 30, 2012, he was at a mall looking at collectible coins with Mr. Richardson and Chris Farrow. Mr. Williams had understood that Mr. Payne might get some pills that night and said that he and Mr. Richardson called Mr. Payne several times about the pills and coins. Mr. Williams planned to see Mr. Payne on January 31. Mr. Williams said that he occasionally bought a Suboxone strip from Mr. Payne for $15 to $20 but that he did not know what Mr. Payne charged for Lortab pills.

-17-

Mr. Williams testified that he met Mr. Curd once or twice. Mr. Williams said Mr. Curd and Jenelle dated. Mr. Williams said Mr. Payne had been hurt over the Facebook harassment because Mr. Payne thought Mr. Curd "was family."

Matthew Richardson testified that he and Mr. Payne worked together and that he bought Suboxone strips and Lortab pills from Mr. Payne. Mr. Richardson said that he had been in communication with Mr. Payne on the evening of January 30, 2012, about drugs Mr. Payne expected to receive that night. Mr. Richardson said he had been in Bristol with Mr. Williams and Mr. Farrow.

Mr. Richardson testified that he knew about Mr. Payne's problems with the Potters but that he was unaware of a meeting at Larry Potter's store involving Jenelle, Barbara, and Mr. Payne in the summer. Mr. Richardson said he had been present when the Defendant and Mr. Payne met at the store in late December 2011 or early January 2012, although he acknowledged the meeting could have been in late November. He said that he and Mr. Williams had been at Mr. Payne's house and that Mr. Hayworth asked them to go to the store with him to ensure Mr. Payne did not "get himself in trouble." Mr. Williams said Mr. Payne took a binder of Jenelle's Facebook comments with him to the meeting. Mr. Williams said that the Defendant, Barbara, Jenelle, Mr. Curd, and Mr. Payne were present. Mr. Richardson said that he was close enough to hear the conversation and that the parties bickered. Mr. Richardson said that, ultimately, the Defendant told Mr. Payne to call him if anything else occurred and that Mr. Payne seemed satisfied with the resolution. Mr. Richardson was unaware of Mr. Payne's having any problems with the Potters between the meeting and Mr. Payne's death. Mr. Richardson agreed he told Agent Lott that he was unaware of Mr. Payne's having problems with anyone other than the Defendant and Jenelle. Mr. Richardson acknowledged his prior written statement, in which he admitted buying drugs from Mr. Payne.

Sarah Wright, a friend of Ms. Hayworth's, testified that although Mr. Payne sold drugs, he did not have a drug "operation." She said Ms. Hayworth and Mr. Payne's infant slept in their bedroom and identified photographs of the room in which Mr. Payne's body was found. Ms. Wright said Ms. Hayworth and Mr. Payne talked about how Jenelle would not leave them alone. Ms. Wright said that she had been at the victims' house when Jenelle called repeatedly and that Ms. Hayworth eventually took the telephone off the hook to prevent further calls. Ms. Wright said the harassment bothered Ms. Hayworth, whom Ms. Wright said did not cause "drama" or fight back.

Dr. Thomas Schacht, an expert in forensic psychology, testified that he reviewed the Defendant's voluminous medical records, spoke with the Defendant once at the jail,

and spoke with Barbara and Jenelle at the Potter residence. Dr. Schacht said the Defendant had nineteen health concerns on his "problems list," which included pulmonary disease, diabetes, chronic pain syndrome, post-traumatic stress disorder, high blood pressure, "neurogenic bladder" requiring catheterization several times daily, severe hearing loss requiring hearing aids, chronic elevated pulse rate, and sleep apnea. Dr. Schacht said the Defendant had been prescribed a high dose of two types of morphine.

Dr. Schacht testified that the Defendant was treated by the VA for chronic hypoxia and that a person's mental functioning was dependent upon adequate body oxygen levels. He said hypoxia could affect a person's perception, judgment, and decision-making abilities. Dr. Schacht testified, though, that no specific research showed that oxygen deprivation made a person more susceptible to suggestions. He said that oxygen deprivation was associated with impaired judgment, memory, coordination, and ability to perform calculations. He said oxygen deprivation could cause emotional changes.

Dr. Schacht testified that the Defendant's VA medical records included a 2004 record showing that the Defendant had been prescribed oxygen for home use for seven years. The records also showed that the Defendant continued using oxygen at home until the time of his arrest. Dr. Schacht said the records reflected that the Defendant's oxygen saturation levels had been extremely low in 2006 and 2009 but that the records did not reflect a measurement of the Defendant's oxygen levels since 2011.

Dr. Schacht testified that Barbara related that she had to help the Defendant remember his medications. Dr. Schacht said Barbara also monitored the Defendant's oxygen level because the Defendant did not use the oxygen continuously and started to get "a little goofy" after being off oxygen for a few hours.

Dr. Schacht testified that if the Defendant experienced hypoxia during the police interview, it would be reasonable to expect the hypoxia had an adverse impact on the Defendant's mental state. He acknowledged, though, that he could not state that the lack of oxygen affected the Defendant during questioning. He had no opinion whether the Defendant exhibited proper judgment and mental abilities during the recorded telephone call with Barbara that occurred during the police interview.

Dr. Schacht testified that people with hearing loss who did not have hearing aids withdrew socially. He said such individuals became distressed by not understanding what was happening. He said people sometimes misunderstood things without realizing it. Dr. Schacht said that he sat close to the Defendant when he spoke to him and that the Defendant appeared to understand, although the Defendant sometimes asked Dr. Schacht to repeat himself. He did not recall if the Defendant wore a hearing aid during their

conversation. Dr. Schacht said that although he viewed the video recording of the Defendant's police interview, he was unable to determine whether the Defendant wore a hearing aid during the interview. Dr. Schacht noticed the Defendant's turning his head during the police interview, which Dr. Schacht said would have been something the Defendant might have done in order to hear.

Dr. Schacht testified that notwithstanding the Defendant's post-traumatic stress disorder diagnosis, the VA records did not reflect that the Defendant received psychiatric treatment.

Dr. Schacht testified that the Defendant's jail records reflected that the Defendant entered the jail on February 7, 2012, that Barbara brought a box of twenty medications that included catheters to the jail, that a nurse practitioner made decisions by telephone approving five of the medications for administration to the Defendant, and that the nurse practitioner did not approve catheter use until two days later.

The defense recalled Agent Lott, who testified that in October 2012, ten months after the victims' deaths, he became aware of new Facebook profiles for Ms. Hayworth, Mr. Payne, the Defendant, and Jenelle. He said that the four profiles reflected that all of the people were friends with each other. He tracked the internet provider addresses to Mexico but could not determine who created the profiles.

Agent Lott acknowledged that he had not determined whether Brad Osborne owned any firearms, that he had not examined Mr. Osborne's truck for trace evidence, and that he did not examine Mr. Osborne's clothing. Agent Lott said Mr. Osborne had been upset and cried about his friend's death when Mr. Osborne was interviewed a few days after the homicides. He said Mr. Osborne provided documentation to show that Mr. Osborne was at work at 6:53 a.m. on January 31, 2012. Agent Lott also acknowledged that the credit card and pipe recovered at the scene near the drug residue had not been tested for DNA.

Agent Lott agreed that a machete was visible in a photograph of Mr. Payne's body. Agent Lott agreed the machete was next to Mr. Payne's arm but said the machete was inconsistent with the weapon the police thought had been used to cut Mr. Payne's neck. Agent Lott said no guns that were consistent with a .38-caliber weapon were located at the scene.

After receiving the proof, the jury found the Defendant guilty of two counts of premeditated first degree murder. The court imposed two consecutive life sentences. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the trial court erred in approving the verdicts because they were contrary to the weight of the evidence, which, for reasons we will explain, we will consider as a challenge to the sufficiency of the evidence. The State contends that the evidence is sufficient to support the convictions. We agree with the State.

The Defendant's statement of the issue is, "The trial court erred in approving a jury verdict which was against the weight of the evidence." In his argument, however, he cites to cases involving appellate review of the sufficiency of the evidence to support the convictions. Tennessee Rule of Criminal Procedure 33(d) provides, in pertinent part, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence."

> Trial judges exercising their thirteenth juror function are acting as jurors. "[T]he trial judge and the jury see the witnesses face to face, hear their testimony, and observe their demeanor on the stand." *Bolin v. State,* 405 S.W.2d [768, 771 (Tenn. 1966)]. Thus, proper factors to be weighed by the trial court include the witness' testimony, demeanor, and credibility, all factors likewise considered by the jury. *See State v. Burlison,* 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). The rule calls upon the trial judge to exercise its role in its traditional capacity.

*State v. Dankworth*, 919 S.W.2d 52, 58 (Tenn. Crim. App. 1995). An appellate court, however, may not function as a thirteenth juror. *Burlison*, 868 S.W.2d at 718-19. The Rules of Appellate Procedure limit the role of an appellate court relative to findings of guilt in criminal cases to the question of whether the evidence "is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." T.R.A.P. 13(e). In that vein, the Rules prescribe that "relief may not be granted in contravention of the province of the trier of fact." T.R.A.P. 36(a). After a trial court has discharged its obligation as thirteenth juror and approved the verdict, appellate review requires "accrediting of the testimony of the witnesses for the state and the resolution of evidentiary conflicts in favor of the state." *Burlison*, 868 S.W.2d at 719 (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). For these reasons, our review of the Defendant's issue is limited to the question of whether the evidence is sufficient to support the verdict.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

"A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility. . . , the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a) (2014).

Viewed in the light most favorable to the State, the evidence shows that the Defendant and his family had a lengthy disagreement with the victims and their friends. Although Jenelle was an adult, she lived with her parents and functioned at the level of an adolescent, and her parents became involved in the dispute with the victims and their associates. Jenelle was involved in a harassment case related to Ms. Thomas. Jenelle's and Barbara's social media and email messages discussed watching and killing the victims and the Defendant's willingness to help Chris with the task. Barbara's messages indicated the Defendant's anger and readiness to do something about the situation.

The Defendant told Mr. Winebarger that the Defendant would put a bullet through Mr. Payne's head if the Defendant ever had the opportunity. Both victims were shot in the head, each by a single bullet. Bullets found in the Defendant's truck were consistent with the caliber of fired bullets found at the scene. One of the fired bullets from the scene and the five bullets from the Defendant's truck had after-market alterations designed to inflict more damage upon striking a target.

Facebook and Topix posts bearing Jenelle's name made disparaging statements about Ms. Thomas and Ms. Hayworth. Documents containing email and social media messages relative to the desire to kill the victims and the Defendant's willingness to help were shredded and found in the back of the Defendant's truck shortly after the homicides, and the Defendant and Barbara discussed that the Defendant had planned to take items to the landfill. Ms. Thomas, Ms. Osborne, and Ms. Hayworth received harassing telephone calls, and Ms. Thomas attributed the calls she received to Jenelle because they came from the Potters' home telephone number.

Mr. Curd implicated himself and the Defendant in the crimes, although he gave contradictory statements about his own involvement. In a recorded telephone call, Mr. Curd asked the Defendant if he had disposed of items from Billy's house, and the Defendant responded affirmatively. The Defendant initially denied involvement and recounted various alleged threats against his family, but when he was allowed to call Barbara, he told her he had been involved and that he "did it." He stated he had done it because of what "they" tried to do to Jenelle and Barbara.

Although the Defendant argues that the Defendant and Mr. Payne had resolved their differences, the Defendant cannot overcome the inculpatory statements he made

about the crimes in the telephone calls with Mr. Curd and Barbara. He argues that these statements are explained by his hearing loss and hypoxia. Evidence of these conditions and the possible effects they might have on his conduct was presented to the jury, which rejected the Defendant's theory. As we have stated, the function of an appellate court is not to reweigh the evidence.

The evidence is sufficient to support the Defendant's convictions of two counts of premeditated first degree murder. We likewise conclude that the evidence is sufficient to support the Defendant's convictions on the alternative theory of criminal responsibility for the conduct of another. The Defendant is not entitled to relief on this basis.

## II

### Timeliness of Motion for a New Trial

The Defendant has raised three additional issues: (1) whether the trial court erred in admitting hearsay evidence as statements of co-conspirators, (2) whether the trial court erred in denying the Defendant's motion for a mistrial due to an absent material witness, and (3) whether the State's use of visual aids during closing argument constituted prosecutorial misconduct. The State contends that the Defendant has waived these issues by failing to file a timely motion for a new trial. The Defendant did not file a reply brief responding to the State's waiver argument.

Tennessee Criminal Procedure Rule 33(b) states, "A motion for a new trial shall be [made] in writing . . . within thirty days of the date the order of sentence is entered." The thirty-day requirement is mandatory and jurisdictional and cannot be waived. *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. Crim. App. 1997); *see* Tenn. R. Crim. P. 45(b)(3) (stating, in relevant part, that a trial court may not extend the time for taking any action pursuant to Criminal Procedure Rule 33). This court "does not have the authority to waive the untimely filing of a motion for new trial." *State v. Patterson*, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997). "A motion for a new trial which is not timely filed is a nullity." *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). As a result, a trial court has no jurisdiction to hold a hearing or render a ruling on an untimely motion for a new trial. *See Martin*, 940 S.W.2d at 569.

Our review of the record and supplemental record has revealed that the verdicts were returned, that the court approved the verdict, and that the court imposed life sentences on October 11, 2013. The court stated that the hearing for determining whether the sentences would be served concurrently or consecutively would take place on October 29, 2013. No transcript or court minutes reflecting the date of the sentencing hearing

appears in the record. The record transmitted to this court contains judgments bearing a "Date of Entry of Judgment" of October 29, 2013, but not bearing the clerk's filed stamp. A motion for new trial was filed on August 12, 2014, and the court heard the motion on December 9, 2014. The court denied the motion in a written order filed on December 15, 2014.

This court has said that the date a judgment is entered by the court clerk is the date from which the thirty-day period for filing a motion for new trial begins. *See, e.g.*, *State v. Stephens*, 264 S.W.3d 719, 728-30 (Tenn. Crim. App. 2007); *see also* T.R.A.P. 4(a), (c). In that regard, "[T]he 'file-stamp' date provides evidence of when the order of sentence was entered by the clerk." *Stephens*, 264 S.W.3d at 729.

Although the date of entry subscribed onto the face of a written order is evidence of the date of entry, the term "entry" itself refers to the official placement of an order into the court's minutes. *See State v. Byington*, 284 S.W.3d 220, 225-26 (Tenn. 2009); *State v. March*, 576, 581 (Tenn. Crim. App. 2008); *see also* T.C.A. § 16-1-106 (2009) ("The minutes of the court for each day's work shall be signed by the judge. The minute book shall provide a place for the judge's signature after the minute entries each day; however, where the orders of the court are photocopied so that an accurate facsimile of the entire order and judge's signature appears, it shall be sufficient for the judge to sign at the end of the minute book approving all minutes in the book."); T.C.A. § 18-1-105(a)(5) (2009) (creating a duty in the trial court clerk to "[k]eep a well-bound book, in which shall be entered the minutes of each day's proceedings during the session of the court, in the order in which they are made").

We note that by agreement of the parties, the trial court ordered a change of venue from Johnson County to Washington County on August 1, 2013. Tennessee Rule of Criminal Procedure 21(e)(1), (2) provides that after a change of venue is ordered, the clerk of the sending court shall provide a complete transcript of the proceedings and relevant documents to the clerk of the receiving court, who shall enter them on the minutes of the receiving court. For reasons that are not explained in the record, the parties' motions and pleadings, the court's orders, and the judgments continued for over nine months to be designated with Johnson County captions, and these documents, aside from the judgments, reflect that the documents continued to be filed with the Johnson County Circuit Court Clerk before eventually being filed with the Washington County Circuit Court Clerk. The judgments of conviction were originally entered into the Johnson County Circuit Court minutes, but those minutes, in apparent non-compliance with Tennessee Code Annotated section 16-1-106 and 18-1-105, do not reflect the exact date on which the minute entries were made, although they appear to have been entered into that court's records in October 2013. The Johnson County minute entries of the

-25-

judgments, however, were certified and sent to the Washington County Circuit Court Clerk.

In order to determine the date the judgments were entered by the Washington County clerk, we ordered and received a supplemental record which contains the Washington County clerk's certification of the judgments, printout of the record of the Washington County clerk's receipt of the Johnson County judgments, and the Washington County clerk's certificate stating that the judgments are on file in Washington County. These documents reflect the judgments were filed in Washington County on May 14, 2014. Because the judgments do not otherwise evince a filing date and because Washington County was the proper place to file the judgments pursuant to Tennessee Rule of Criminal Procedure 21, we consider May 14, 2014, the date of entry. We conclude, therefore, that the Defendant had thirty days from May 14, 2014, to file his motion for a new trial. We likewise conclude that the motion for a new trial he filed on August 12, 2014, was untimely. *See* Tenn. R. Crim. P. 33(b).

Because the motion for a new trial was untimely, the trial court lacked jurisdiction to consider it, and the trial court's erroneous consideration of the motion does not validate it. *See, e.g.*, *State v. Martin*, 940 S.W.2d, 567, 569 (Tenn. 1997); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Rule 3(e) of the Tennessee Rules of Appellate Procedure provides, in part:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

For this reason, our consideration of the Defendant's remaining issues is limited to review for plain error. *See* T.R.A.P. 13(b), 36.

In reaching this conclusion, we have considered unpublished opinions of this court which have concluded that, when faced with questions of timeliness of a post-judgment motion, the motion cannot be treated as untimely if the judgment did not contain a filed stamp. In *State v. Bobby Lee Allen Robinette*, No. E2014-01688-CCA-R3-CD, 2015 WL 4745065 (Tenn. Crim. App. Aug. 11, 2015), the defendant pleaded guilty. Judgment forms were signed by the judge, and the line on the judgment forms marked "Date of Entry of Judgment" was completed, but the judgments were not stamped filed. *Id.* at *2.

Thirty-one days after the "Date of Entry of Judgment" listed on the judgment forms, the defendant filed a motion to withdraw his guilty plea. *Id.* Upon appeal of the trial court's denial of the motion, this court considered whether the judgment became final before the motion was filed and thereby deprived the trial court of jurisdiction to consider the motion. *Id.* The panel relied upon *Stephens* for the proposition that the date the judgment was filed by the clerk was evidence of the date of its entry by the clerk. *Id.* at *3. The panel noted two unpublished decisions that held the "Date of Entry of Judgment" was insufficient evidence of the date the trial court clerk entered the judgment. *Id.* (citing *State v. Kenny Kimble*, No. W2012-00407-CCA-R3-CD, 2013 WL 3795949 (Tenn. Crim. App. July 22, 2013), and *State v. Jeremy Wendell Thorpe*, No. M2014-00169-CCA-R3-CD, 2015 WL 1242964 (Tenn. Crim. App. Mar. 16, 2015)). The panel then concluded that in the absence of a filed stamp, the defendant's motion to withdraw his plea was timely despite its having been filed thirty-one days after the "Date of Entry of Judgment" noted on the judgment forms. *Id.* at *4.

In *Kenny Kimble*, the judgment form contained a handwritten "Date of Entry of Judgment" but was not stamped filed. 2013 WL 3795949, at *1. A motion for a new trial was filed more than thirty days after the Date of Entry of Judgment. *Id.* The *Kenny Kimble* panel ordered supplementation of the record in order to ascertain the date of entry of the judgment by the clerk, but the supplemental record showed that "no judgment of conviction or minute entry . . . precisely states the date the judgment was filed by the trial court clerk." *Id*. at *2. The panel said that in the absence of a filed stamp and without the clerk's signature next to the "Date of Entry of Judgment," it was unable to conclude that the motion for a new trial had been untimely. *Id.* at *4.

In *Jeremy Wendell Thorpe*, the judgment contained a "Date of Entry of Judgment" but was not stamped filed. 2015 WL 1242964, at *4. The motion for a new trial was filed thirty-one days after the Date of Entry of Judgment. *Id*. The panel relied upon the *Stephens* and *Kenny Kimble* decisions in concluding that "because the judgment of conviction is not marked by any person in the trial court clerk's office as to the date it was filed," the panel could not determine the entry date of the judgment. *Id.* Therefore, the panel reasoned, it could not determine the date from which the thirty-day period for filing a motion for a new trial. *Id.* Ultimately, however, the panel disagreed with the State's calculation of the period for filing the motion for a new trial because the State calculated the deadline for filing based upon the Date of Entry of Judgment but failed to account for the deadline's, as calculated from that date, falling on a Sunday and thereby giving the defendant an additional day to file the motion. *Id.* at *4-5. The panel concluded that the motion for a new trial had been timely filed and considered the merits of the appeal. *Id.* at *5.

-27-

The *Bobby Lee Allen Robinette* and *Jeremy Wendell Thorpe* panels do not appear to have considered the trial court clerk's minute entries in resolving the question of the date of entry of the judgments. The *Kenny Kimble* panel considered the clerk's minute entries, but the entries did not contain the necessary information. In the present case, we have examined the relevant trial court clerk's records and certification, and they establish that the Washington County clerk entered the judgments in its minutes on May 14, 2014. We are, therefore, able to ascertain the period within which the motion for new trial should have been filed.

We note that pursuant to the Rules of Appellate Procedure, "an appeal as of right by a defendant lies from any judgment of conviction *entered by a trial court*[.]" T.R.A.P. 3(b) (emphasis added). The notice of appeal must be filed with the trial court clerk "within 30 days after *entry of the judgment* appealed from." T.R.A.P. 4(a) (emphasis added). "The jurisdiction of the court of criminal appeals shall be appellate only, and shall extend to review of the final judgments of trial courts in . . . [c]riminal cases, both felony and misdemeanor." T.C.A. § 16-5-108(a)(1) (2009). It is the duty of this court to determine whether jurisdiction exists in every case. *State v. Comer*, 278 S.W.3d 758, 760 (Tenn. Crim. App. 2008). Consideration of the merits of an appeal in which the record contains a judgment which neither bears a filed stamp nor is accompanied by evidence of the date of the clerk's entry of the judgment may, in some circumstances, exceed the jurisdiction of this court. It was for this reason that we ordered supplementation of the record in the present case to determine the date the clerk entered the judgments in Washington County. We note, however, that the district attorney general bears the burden of ensuring that the judgment forms are filed with the court clerk. T.C.A. § 40-35-209(e)(1) (2014); *see State v. Martin Boyce*, No. W2012-00887-CCA-R3-CD, 2013 WL 4027244, at *9 (Tenn. Crim. App. Aug. 6, 2013); *Kenny Kimble*, 2013 WL 3795949, at *4. Adherence to this requirement by the district attorney general will avoid such dilemmas in future cases.

## III

## Admission of Hearsay Evidence

The Defendant contends that the trial court erred in admitting hearsay evidence as statements of co-conspirators. He argues that the evidence failed to show a conspiracy among himself, Barbara, Jenelle, or Mr. Curd. The Defendant's argument does not clearly identify the statements he contends should not have been admitted. He refers to "documents provided by the State," which we interpret to be a reference to the shredded and reassembled email and social media messages. We will limit our consideration to these evidentiary items.

-28-

As we have stated, our review of this issue is limited to consideration of whether plain error exists. Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

In the present case, the record does not clearly establish what occurred in the trial court. We note that the Defendant's brief relative to this issue fails to provide any citations to the voluminous record relative to any motions filed and hearings held regarding the admissibility of this evidence. *See* T.R.A.P. 27(a)(6) (requiring that an appellant's brief shall contain a statement of the facts relevant to the issues presented with appropriate references to the record). Upon review of the record, we note a document filed under seal on September 27, 2013, titled "Motion in Limine Regarding Admissibility of Statements of Alleged Co-Conspirators," which addressed the social media and email documents. The motion alleged that the State had previously provided a document to the defense titled "State's Pretrial Brief on Admissibility Issues" and that the State's brief addressed the social media and email documents. The State's Pretrial brief on Admissibility Issues is neither in the technical record nor in the sealed documents. The Defendant's motion in limine requested a pretrial hearing. The Defendant states in his appellate brief that "the Court agreed to allow the parties to be heard on the issue on October 1, 2013. The Court made a preliminary ruling on the admissibility of hearsay statements contained in the documents by redacting them in chambers and emailing them to the parties at a later date." No transcript of the hearing or written order of the trial court relative to the hearing appears in the record. At the trial, the trial court advised the jury relative to the documents:

> Ladies and gentlemen, these documents were submitted to the court prior to their . . . admission into evidence here today at a hearing several

-29-

weeks ago. The purpose of these documents being submitted to the court to review is that these documents as they were pieced together contained quite a bit of material that did not have anything at all to do about this case as you would imagine in emails. And, so, what the court has done is I have taken and blacked out all those portions that were placed together that . . . bear no relevance whatsoever on this case. So, when you see a . . . document that will be broadcasted to you or – or examined to him and you see black marks those black marks were placed there . . . by the court to redact, or cover up those . . . items that have absolutely nothing to do with this case.

Because the record fails to contain all of the necessary information relevant to this issue, plain error review is inappropriate, and no further consideration is required. *Smith*, 24 S.W.3d at 283.

## IV

## <u>Denial of Motion for a Mistrial</u>

The Defendant contends that the trial court erred in denying his motion for a mistrial that was based upon the absence of a material witness. During the Defendant's case-in-chief, defense counsel stated during a bench conference that Jamie Stout, who had been subpoenaed by the defense, had failed to appear. Counsel stated that earlier in the week, Mr. Stout had notified the defense by telephone that Mr. Stout's wife was sick and that the previous day, Mr. Stout's wife was "supposedly in and out of the hospital." Counsel said he spoke with the witness the previous evening. Counsel said Mr. Stout sent a text message to counsel's daughter stating he was between the courthouse and Elizabethton and observed, "[O]f course, he could have walked here by now." Counsel said he had been notified by text message a few minutes earlier that the witness was at Fish Springs. Defense counsel made a motion to hold Mr. Stout in contempt for failing to appear. The court ordered that a capias be issued and that Mr. Stout be held on a $50,000 bond.

The court inquired whether the defense was going to rest, and defense counsel responded affirmatively. Counsel stated that Mr. Stout was a material witness and that Mr. Stout's absence had caused "irreparable harm" to the defense. Counsel stated that Mr. Stout's absence was grounds for a mistrial. The court permitted counsel to state on the record the substance of Mr. Stout's anticipated testimony. Counsel stated:

[W]e had interviewed him on three or four occasions.  He said that the afternoon of the murders that Brad Osborne, who was the young man who said he went into the house and did not find anybody, or didn't check on anybody, was going to bring the deceased to work, that that afternoon that he was with this man at his apartment and this -- and this witness told him that Brad Osborne had told  -- excuse me, Brad Osborne was at this man's house, Jamie Stout's, and told him that he was in fact – he did find the bodies.  That he called his wife from the house and said what should I do.  And she said get out of there they're going to blame you for this, and he went on to work leaving the child in there crying on the floor with this woman for hours, or God knows how long it would have been if somebody hadn't come along, we don't know.  He didn't go make a 911 call anonymously or otherwise, and so, it was our theory that he probably shot them.  So, it fit in, so that would be our argument to be made on that and that's – that's what he had told us.

At the close of the offer of proof, the court stated, "All right" and instructed the courtroom officer to bring in the jury, but the court did not rule on the Defendant's motion for a mistrial.  The jury returned to the courtroom, the defense rested, and arguments were heard.

A trial judge should declare a mistrial if manifest necessity arises.  *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977).  Manifest necessity occurs when "no feasible alternative to halting the proceedings" exists.  *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981).  "The granting or denial of a mistrial is within the sound discretion of the trial court."  *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996); *see State v. Jones*, 802 S.W.2d 221, 222 (Tenn. Crim. App. 1990).  This court will only disturb that decision if the trial court abused its discretion.  *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

We begin by noting the trial court's failure to rule explicitly upon the Defendant's motion for a mistrial.  Once the motion was made, the court had the obligation to make a finding whether a manifest necessity existed for a mistrial and if so, to grant the motion.  It is apparent from the record, however, that the court was disinclined to grant the motion.

The Defendant has not explained a theory of admissibility for Mr. Stout's testimony.  He likewise has not explained how Mr. Stout's testimony would have had any meaningful impact on the defense, such that no feasible alternative existed except halting the proceedings.

Had Mr. Stout testified as defense counsel anticipated, his testimony would have consisted of Mr. Stout's recounting his conversation with Mr. Osborne about Mr. Osborne's observations and actions at the victims' house and Mr. Osborne's conversation with Ms. Osborne about what he should do after having found the deceased victims. This evidence would have been hearsay. *See* Tenn. R. Evid. 801(c) (hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.") The Defendant has not advanced any hearsay exception or other basis upon which the rule against hearsay could have been defeated. *See* Tenn. R. Evid. 802 (hearsay is inadmissible unless an exception to the rule applies).

We acknowledge that a defendant's due process rights may override a hearsay bar in some cases. *See Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). In the present case, however, the Defendant has not shown that he was deprived of the opportunity to present a defense in the absence of Mr. Stout's testimony. The Defendant's theory was that he did not commit the crime, that his statement was not knowingly and voluntarily given, that Mr. Curd had lied about the Defendant's involvement, and that the police had rushed the investigation and prosecution. Mr. Stout's prospective testimony, at most, would have reflected upon Mr. Osborne's credibility. The import of Mr. Osborne's testimony was to help show the timeline of the crimes. When recalled during the Defendant's case-in-chief, Agent Lott testified that Mr. Osborne was interviewed twice, that Mr. Osborne was upset and cried about the death of Mr. Payne during the first interview, and that Mr. Osborne provided documentary evidence to show he was at work around the same time he testified he had arrived. Nothing in Mr. Stout's prospective testimony about Mr. Osborne's statements suggested that Mr. Osborne committed the crimes. Mr. Osborne and Ms. Osborne testified about their friendship with the victims, and Mr. Osborne had stayed at the victims' house during his own domestic troubles. Mr. Osborne and Mr. Payne carpooled together to work. Nothing suggests that Mr. Osborne killed the victims. Likewise, the timeline of the crime, while relevant, was not a critical inquiry in the case. Mr. Stout's prospective testimony was not material to the defense. Had Mr. Stout complied with his subpoena, the Defendant would not have had a due process right to offer Mr. Stout's testimony notwithstanding its hearsay character.

The Defendant has not shown that a clear an unequivocal rule of law was breached, that a substantial right of the Defendant's was adversely affected, and that consideration of an error is necessary to do substantial justice. *Smith*, 24 S.W.3d at 282. He is not entitled to plain error relief.

# V

## **Prosecutorial Misconduct**

The Defendant contends that the State's use, during closing argument, of a visual aid containing a red border was prosecutorial misconduct which necessitated a mistrial. The record reflects that the defense objected to the visual aid during the State's closing argument. Defense counsel did not specifically request a mistrial, although he argued that the jury "has been improperly influenced." Defense counsel argued that the visual aid was inflammatory because the red border looked like blood, an argument he repeats on appeal. After the prosecutor responded that the border's color could be changed, the court overruled the objection. The record does not reflect, though, whether the State changed the border color, and it does not reflect any further defense objection to the border color.

The Defendant alleges in his brief that the visual aid consisted of "co-conspirator statements, outlined in a blood red border, pasted over images of the victims and their infant son." The appellate record does not contain the visual aid to which the Defendant objected. We are unable to conduct appellate review of an issue for which the record does not contain a fair, accurate, and complete account of what occurred in the trial court. *See Bunch*, 646 S.W.2d at 160; *Miller*, 737 S.W.2d at 558. For this reason, we conclude that the record does not clearly establish what occurred in the trial court, and plain error relief is not appropriate. *See Smith*, 24 S.W.3d at 282.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE